IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2019 FEB 14  PM 1:50

DEPUTY CLERK

| | | |
|---|---|---|
| JEFFREY NEAL CUDDINGTON,<br>Prisoner ID # 62565-037, | § | |
| | § | |
| | § | |
| Movant, | § | |
| | § | Civil No. 6:18-CV-0019-C-BL |
| v. | § | (Criminal No. 6:16-CR-0028-C-BL (01)) |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent. | § | |

## REPORT AND RECOMMENDATION

Under consideration are Grounds 7 and 8 of Movant's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (doc. 4). He claims that his former attorneys, Christopher W. Lewis and Gregg Gallian,[1] rendered ineffective assistance by failing to consult with him about filing an appeal in his underlying criminal action (Ground 7) and failing to file an appeal as requested (Ground 8). *See* Attachment to Am. Mot. at 1. Respondent ("the Government") opposes both claims and contends that strong evidence refutes them, but concedes that an evidentiary hearing is necessary to properly resolve them. *See* Resp. Mot. (doc. 8) at 21-23.

On July 30, 2018, the Court referred the motion "for an evidentiary hearing on Movant's claim that his trial counsel failed to protect his appellate rights" and for a recommendation on that claim as set out in Grounds 7 and 8. *See* Am. Order (doc. 11). In late 2018, the undersigned held an evidentiary hearing, admitted six exhibits,[2] heard testimony from five witnesses (Movant; his

---

[1] Although Lewis was the only attorney of record for Movant in the underlying criminal matter, Gallian worked with him at the same firm and provided assistance on the case.

[2] The exhibits are docketed with the Court's exhibit list from the hearing. *See* Doc. 34. For ease of reference, citations to the exhibits may simply refer to Ex. 1, Ex. 2, etc.

father, James Cuddington; his fiancée, Vanessa Smiley; and his former attorneys), granted a request for the parties to submit proposed findings of fact and conclusions of law, and took the matter under advisement pending written recommendation.  The undersigned now recommends that the Court (1) deny Ground 8 of the motion to vacate because Movant has not shown by a preponderance of the evidence that he or his agents expressly requested counsel to file an appeal, but (2) grant Ground 7 because he has demonstrated that counsel breached the constitutionally imposed duty to consult and the failure to consult prejudiced him.

## I. PROCEDURAL HISTORY

In October 2016, the Government indicted Movant on a single count of Receipt and Distribution of Visual Depictions of Minors Engaging in Sexually Explicit Conduct and Aiding and Abetting, in violation of federal law.  *See United States v. Cuddington*, No. 6:16-CR-028-C (N.D. Tex.) (doc. 1).  Documents in his criminal case show his arrest later that month and a not guilty plea at his arraignment on November 16, 2016.  *See id.* (docs. 4 and 8).

On November 28, 2016, Movant entered into a Plea Agreement, which the parties filed in the criminal case on December 1, 2016.  *See id.* (doc. 11).  That Agreement informed Movant that the maximum penalty for his offense included a term of "imprisonment for a period of not less than five (5) years, nor more than twenty (20) years."  *Id.* at 2.  It does not mention his appellate rights or limit those rights in any way.  *See, generally, id.*  On December 13, 2016, Movant pled guilty at his re-arraignment.  *See id.* (doc. 17).

Movant appeared for sentencing on April 21, 2017.  *See id.* (dkt. entry 34).  The Court adopted the presentence report ("PSR") "not only as it relates to the background data and information, but also the analysis made under the sentencing guidelines."  Tr. of Sentencing (Ex. 6) at 3.  The Court

then heard argument from defense counsel and Movant read a prepared statement. *See id.* at 3-11.

Having heard from counsel and Movant, the Court adjudged Movant guilty and imposed sentence,

including a 188-month term of imprisonment followed by a 20-year term of supervised release. *See*

*id.* at 11-13. Finally, the Court stated on the record the specific reasons for imposing the sentence

and addressed Movant's right to appeal. *Id.* at 13. In full, the Court stated:

> As to the term of incarceration, I've imposed a term of 188 months. I believe this
> sentence does adequately address the sentencing objectives of punishment and deter-
> rence.

> The supervised release is imposed for the reason I believe the defendant will need
> this amount of supervision to see that he reassimilates himself back in society, that
> he obtains suitable employment, and that he maintains a law-abiding lifestyle.

> No fine is assessed.

> The special assessment is imposed because the law mandates that it be.

> Now, Mr. Cuddington, you have the right to appeal, as authorized by law or as stated
> in your plea agreement. Should you choose to appeal, you must file your notice of
> appeal within 14 days from today. If you file that notice of appeal, you may also file
> a motion with the Court seeking permission to appeal at no cost to yourself, but
> rather at the cost of the government. Should you file that motion, I will take it under
> advisement just as soon as I can.

*Id.* The Court then remanded Movant to custody of the marshal, had him stand aside, and granted

counsel's request to be excused. *Id.* at 14.

Movant timely commenced this action in April 2018 by filing a pro se motion to vacate under

28 U.S.C. § 2255. At the direction of the Court, he filed the amended motion currently at issue. He

set out the following supporting facts for Ground 7:

> When I received the plea agreement, my lawyer stated that we could appeal the
> sentence and that he would be available to appeal if I wanted to do so at that time.
> My lawyer did not discuss with me post-sentencing the advisability of any appeal, or
> possible grounds for appeal; he was not accessible to me nor to the family members

3

assisting me.

Attachment to Am. Mot. at 1. Similarly, he set out the following supporting facts for Ground 8:

> My father and my fiancée (who had authority to interact with my lawyer on my behalf) contacted defense counsel after sentencing to ask him to file an appeal for me and he did not do so; his associate counsel (who was the only one who would communicate with them) told them he was not an appeal lawyer and we would need to talk to one if we wanted to appeal.

*Id.* Movant attached three sworn declarations to support his motion, *see* Movant's Decl.; Father's Decl.; Smiley Decl., and on June 25, 2018, he filed a brief in support (doc. 7).

The Government filed its response and an appendix, which includes affidavits from Lewis and Gallian to address the claims against them, including Grounds 7 and 8, and Lewis attached email exchanges between him and Movant. *See* App. Resp. Mot. (doc. 9). After the Court referred the motion for recommendation, Movant filed a reply brief (doc. 12) and a motion to expand the scope of the hearing (doc. 14). Upon receiving briefing on the motion to expand, the undersigned denied that motion, set an evidentiary hearing, and appointed counsel to represent Movant at the hearing and to file any objection to this recommendation. At the evidentiary hearing, the undersigned granted a request for the parties to submit proposed findings of fact and conclusions of law. Having received those submissions (docs. 37-38), this matter is ready for recommendation.

## II. SUMMARY OF EVIDENCE

The five previously identified individuals provided sworn testimony at the evidentiary hearing. *See* R. Evid. Hrg [hereinafter R.] 2. Six exhibits were also admitted at the hearing. *See* Doc. 34. Furthermore, to the extent they address Movant's appellate rights, the Court may consider the sworn declarations submitted to support or oppose the amended motion to vacate. Based on the referral of this action for resolution of two particular grounds for relief, this evidentiary summary will

naturally relate primarily to those two grounds. The witnesses testified as to their involvement and recollections of various meetings and other communications between Movant and counsel.

Movant and Lewis provided testimony concerning their attorney-client relationship. *See* R. 6-48 (Movant); 93-132 (Lewis). Lewis specifically testified that he and Movant "spoke about the appeal rights on at least four occasions," some it was just "mentioned', but "other times, we spoke in detail." R. 102. In his discussions about appellate rights, Lewis does not recall telling Movant that he could receive court-appointed counsel, but Movant never asked follow-up questions after being told him he had a right to appeal. R. 105-06. Counsel had "zero doubt" that Movant understood his appellate rights. R. 106. Notably, Lewis stated that "talking to Mr. Gallian is the same as talking to [him]." R. 101-02.

The fiancée provided testimony regarding matters occurring after Movant retained Lewis, including an email she sent April 25, 2017, and a conference phone call with Gallian on May 4, 2017. R. 48-82. Movant's father testified as to his involvement between arraignment and the May 4, 2017 conference call. R. 82-93. Gallian testified as to his involvement with the criminal case and that he appeared at one hearing only – Movant's arraignment. R. 132-34. Although he had numerous phone conferences with Movant, he did not recall talking to Movant about his appeal rights and did not witness Lewis and Movant discussing those rights. R. 134. He also testified about the May 4, 2017 conference call with Movant's fiancée and father. R. 134-38.

Given the testimony and the specific issues currently referred for recommendation, it appears helpful to sub-divide the evidence by topic or time-period rather than witness by witness. Although certain testimony may transcend a particular topic or time-period, it will be summarized wherever necessary to provide appropriate context.

5

## A. Pre-indictment

Lewis recalled an hour-long phone call with Movant in June 2015 where they discussed a potential attorney-client relationship and agreed to schedule a face-to-face meeting the next month. R. 96. Following a two-hour meeting the next month, Movant retained Lewis and his firm to represent him in matters relating to potential criminal charges resulting from a June 2015 search of his residence in San Angelo, Texas. R. 7, 96. He paid $15,000 as an original retainer, plus $2,500 for travel expenses. R. 9.

When Movant retained Lewis, they both understood and agreed that the firm would only represent him through trial and if Movant decided to appeal, he would need to retain another attorney to handle the appeal. R. 11-12, 97. This agreement was set out in an engagement letter Lewis provided to Movant and which they discussed in detail in July 2015. R. 97, 102. According to Lewis, he discussed Movant's appeal rights when he presented the engagement letter and they went over every single detail of the letter. R. 102. Movant does not recall whether he and Lewis discussed appeal rights at that meeting. R. 8.

Except for this July 2015 meeting, counsel and Movant communicated exclusively by email and telephone prior to indictment. R. 9, 99. And in an email dated July 22, 2015, Movant stated:

> Lastly, I understand your involvement ends at sentencing. Once I'm on my way and inside, how do I get information on my case, my options, my situation? Will a case-worker be assigned to me? In Texas, I will be a thousand miles from anyone who knows me. I won't have any opportunity for family visitation. How do I handle my situation from the inside?

R. 11; *accord* Ex. 1. Lewis responded: "You can always contact me. Accessing information about your case will not be an issue." R. 12; Ex. 1. Despite his questions, Movant understood that his retainer "would only pay for up to sentencing" and would "not include trial." R. 12. Furthermore,

Lewis "was clear that if [Movant] went to trial, there would be an additional retainer." *Id.* According to Movant, from the outset, the plan was to wait for an indictment, plead guilty, and go to sentencing. R. 13.

## B. Arraignment to Sentencing

Movant next met with Lewis in person just prior to his arraignment on November 16, 2016. R. 14-18, 51, 99. They met for less than fifteen minutes to discuss what would happen at arraignment. R. 16, 51-52. Lewis told him that the only purpose of the arraignment was to inform him of the charges against him, he would plead not guilty, and they would receive a scheduling order. R. 99. They also met for about five minutes after the hearing to discuss what would happen next and for Movant to sign some paperwork. R. 17-18, 52. At neither of these meetings did they discuss appellate rights or anything of that nature. R. 17, 52, 102. Movant's fiancée and father were present at these meetings. R. 18, 51, 84.

His father testified that, although he did not personally talk to Lewis until after the arraignment, he asked Lewis about the appeal process "thirty seconds after the hearing was over." R. 84. Recognizing that the arraignment is at the start of the criminal case, he was nevertheless concerned how pleading guilty would affect his son's rights. R. 84-85. So he asked, "what rights do we have? If we don't like the outcome, what can we do about an appeal?". R. 85. And according to the father, Lewis responded: "Mr. Cuddington, your son is pleading – there is no appeal. Your son is pleading guilty." *Id.* Lewis expressly denied that this conversation took place and stated that he has "never spoken about a person's appellate rights at . . . an arraignment." R. 102. No one else testified about such a conversation.

Because Movant's conditions of pretrial release prohibited use of the internet and computers,

his father and fiancée communicated with his attorneys via email on his behalf. R. 19, 49-50, 83, 99. They both acted as his agents for communicating with counsel. R. 19-20, 49-50. Movant would also call counsel. R. 20. At some point during a telephone conversation, Movant and counsel discussed the sentencing guidelines and how they may apply to him. R. 20-22.

The Monday before Thanksgiving (November 21, 2016), counsel forwarded a proposed plea agreement via email to Movant's father who relayed it to Movant the next day. R. 22-23. The email included a deadline to have a signed copy returned to counsel. R. 23. Because he was "kind of in a bit of a shock reading it in black-and-white detail," Movant called Lewis that day. *Id.* According to Movant, Lewis stated that "he had reviewed the evidence," asked Movant a couple of questions, and simply stated that "[t]his was the plea agreement." *Id.* Movant told him he needed some time to really understand it and formulate any questions. *Id.* Due to the Thanksgiving holiday, Movant had difficulty contacting counsel during the period given to accept the plea agreement. R. 23-24.

After discussing the matter with his father and fiancée, Movant signed the agreement and returned it to Lewis so that counsel would have it, if Movant indeed decided to go through with the plea. R. 24. When Movant finally contacted counsel the Monday after Thanksgiving, he questioned why he was simply pleading to the charge in the indictment rather than "pleading down," and asked whether there was anything "we can get out of this." *Id.* Lewis informed him that the plea offer was his "best option at the time." *Id.* Although Movant stated in his declaration that Lewis told him he "would be available post-sentencing for any appeals if [Movant] wanted to do so," Movant's Decl. ¶ 8, Movant testified that he does not recall counsel discussing any possible appeal issues or even bringing up his right to appeal during this conversation, R. 27. He knew that he had fourteen days to appeal and sentencing was Movant's priority at that time. R. 28. As he testified: "I wasn't con-

cerned about an appeal; I was more looking into, okay, how well can we get through sentencing first. If sentencing went well, I wouldn't need an appeal. So it wasn't something I was concerned about." *Id.* The strategy was to focus on sentencing and to try to get as little time as possible. *Id.*

Although not clear from his testimony as to whether the discussion occurred via email or by telephone, Lewis stated that he had talked to Movant about his appellate rights when he "presented him with the plea paperwork." R. 103. Recognizing that the plea paperwork did not mention appellate rights, he specifically stated: "I told him I said, you have the right to appeal. It's my practice with every single client to tell them, you have a right to appeal, and it's 14 days." *Id.*

Lewis also met Movant prior to re-arraignment at a coffee shop for no more than thirty minutes. R. 54, 99-100. At this meeting, Movant provided Lewis with a letter granting his fiancée permission to act as his agent and advising Lewis that he had permission to receive messages from Movant through the fiancée. R. 55. Topics of discussion were her agency status, whether Movant would be detained following his guilty plea, character letters, and a psychological evaluation. R. 55-56. According to Lewis, Movant's primary concern at that time was whether he would be taken into custody following his guilty plea. R. 100. Lewis explained that he could not predict the outcome but would argue for release on the same conditions then in place. *Id.* Lewis also stated that they spoke about his appellate rights prior to the re-arraignment and the Court also spoke about appellate rights during the re-arraignment. R. 103.

Movant agreed that, in the process of preparing for sentencing, counsel did inform him at some point that he had fourteen days to file an appeal. R. 27-29. Although their focus was mostly on the sentencing and how well [they] could get through sentencing, counsel made Movant aware that he could appeal afterwards. R. 29. In addition, Movant had read it in a book. *Id.* While he

9

"was aware of it," appealing "wasn't something that was on [his] mind," and he does not "remember any kind of lengthy conversation or strategy about [an] appeal." *Id.*

Movant did not recall speaking to counsel about character witnesses, but his fiancée obtained letters on his behalf. R. 29. According to Movant, Lewis did not see a need for a computer expert or a psychological evaluation. R. 30. Although counsel attached character letters and a summary report from a psychologist to a sentencing memo, Movant stated that he and his fiancée initiated getting those things. R. 30-31. Movant raised the idea of character witnesses to counsel who said "yeah, it's a good idea if you want to do that." R. 30. Movant had started seeing a psychologist before even hiring counsel. R. 31.

Addressing the PSR for this case was another aspect of sentencing preparation. R. 32. When Movant reviewed the PSR, he made factual objections to various matters and submitted them to Lewis. R. 32-33. Movant expected counsel to seek a downward variance or at least a sentence at the bottom of the guidelines range. R. 34. His fiancée likewise understood that counsel would try to get as low a sentence as possible. R. 59-60. Counsel had told Movant that the judge historically sentenced "at the maximum range and to expect that," but Movant still had hired Lewis to get "the best possible outcome on the sentencing." R. 34. Lewis discussed with Movant that, if sentencing did not go his way, Movant could appeal. R. 35.

The week leading up to Movant's April 21, 2017 sentencing, Movant tried to contact Lewis to discuss what to expect, but received no response. R. 77-78. The lack of response caused his fiancée to email the firm in an effort to set up a meeting for the night prior to sentencing. R. 78; Ex. 2. The email prompted no written response, but Lewis did call Movant late in the evening on April 20, 2017. R. 78. The fiancée also testified that she instructed Movant to prepare an allocution state-

10

ment. R. 79.

## C. Morning of Sentencing

The morning of his sentencing hearing, Movant and his fiancée met with counsel at his hotel. R. 36, 63-64, 100-01, 120. Movant estimated the duration at thirty to sixty minutes, R. 36, his fiancée stated it was fifteen to twenty minutes at the most, R. 64, and Lewis stated that the "conversation took upwards of an hour to answer every question that they had," R. 101. Movant wanted Lewis "to thoroughly explain whats going to happen at sentencing." R. 100. They discussed what to expect at sentencing and the reading of a prepared statement. R. 35-36.

The fiancée testified that one topic of discussion was "an appeal or the possibility of an appeal, but [Lewis] told [them] that because the judge is going to sentence within the guidelines, there's not really any reason to appeal, because you can't appeal that." R. 64. At that time, she was "very distracted," but did not think "that was an accurate statement" and asked Lewis whether the judge would consider Movant's "character or other things" given the attorney's statements to expect the top of the guidelines – 188 months. *Id.* According to her, Lewis essentially said "there's nothing we can do." R. 65. Lewis, on the other hand, testified that at this meeting he said: "[R]emember, you've got 14 days from the date – essentially from the date of the sentencing, from the date of the judgment, to file an appeal. I'm going to ask you, after sentencing, if you want me to file a notice of appeal." R. 103; *accord* R. 121. In his testimony at the evidentiary hearing, Movant did not mention any discussion about potential appeal issues.

## D. Sentencing Hearing

Later that day, the Court sentenced Movant to 188 months imprisonment and he was handcuffed and taken into custody at the podium. R. 36-37. He had no opportunity to say good-bye to

his fiancée, R. 36, who was very shocked that he was immediately taken into custody, R. 65-66. Before he was taken into custody, the Court advised him about his right to appeal and that he had fourteen days to do that. R. 44. At the conclusion of the sentencing hearing, Lewis asked permission to be excused, which the Court granted. Tr. of Sentencing at 14. The testimony diverges somewhat at this point, so it will be set out witness by witness.

### 1. Movant

Movant "had to wait for another case," before the marshals took him "downstairs into a hallway." R. 37. At that point, as Terry County personnel gathered his clothes, belt, and personal items, Movant was "still kind of emotional, reeling from the 188 months, plus the extra 20 years that was for supervised release, plus the lifetime registration." *Id.* As he stood "in handcuffs and being half stripped down in this hallway, he was a little out of sorts, but remembers handing his stuff to somebody" and "answering some questions." *Id.* In "hindsight," he believes it was Lewis and "at some point, someone did ask [him], are you going – do you need an appeal?". R. 37-38. To which he commented, "something to the effect of, well, what do we have to appeal, or what is there to appeal?". R. 38. Movant was very confused, emotional, and shocked at that time. *Id.*

### 2. Fiancée

After the judge granted permission for Lewis to be excused at the conclusion of sentencing, Lewis whispered something to Movant for a minute or less before leaving the courtroom. R. 66. Before the next hearing started, she asked a "security officer or someone" what she was supposed to do and she was directed to go to the marshals office. R. 67. Once there, she was told she could not see Movant and, about ten to fifteen minutes after sentencing, Lewis and the prosecutor arrived. R. 67. Lewis handed her Movant's belongings "that he couldn't take with him" and told her about

other property out in the hall that needed to be returned to Movant's father. R. 68. At that point, she

asked him "if he had submitted an appeal or when he was going to submit an appeal," to which he

replied that he had to catch a flight, she needed to take care of Movant's property, and he would talk

to her later. *Id.* Based on that conversation, she thought that Lewis knew they wanted to appeal and

he would do what needs to be done for an appeal. *Id.*

### 3. Lewis

Following sentencing, Lewis recalled speaking to Movant about appealing. R. 103-04. He

stated that he first apologized for the outcome; expressed his pre-sentence fear of that result; "said,

it doesnt even seem to me that Judge Cummings considered any of [material provided or the argu-

ments presented]"; and then "said, now I got to ask you, do you want me to appeal?". *Id.* Counsel's

exact words were, "do you want me to file a notice of appeal?". R. 107. To which Movant stated,

"no, I don't see that there are any grounds for appeal," and Lewis agreed. *Id.*; *accord* R. 104. That

ended the brief conversation, counsel left the courtroom, and there were no subsequent conversations

with Movant. R. 107, 127. On cross-examination, Lewis stated that this final communication occur-

red in the courtroom before any other case commenced. R. 124.

Lewis also recalls speaking to the fiancée after sentencing in a downstairs marshals' office.

R. 107. He described her as a little frazzled and she had two main concerns: (1) seeing Movant and

(2) retrieving his property. R. 107-08. While explaining that second topic of discussion, he stated:

> And then the other thing that she was wanting to know was about the return of his
> property, because the agents had already told us that there were certain items that
> they didn't feel had evidentiary value and that they were going to return. As I recall,
> they said it's a box of stuff. And – but there were other items that Mr. Cuddington
> wanted back. And I think even, you know, talk – I'm remembering some questions
> about did he file a notice of appeal. Postsentencing, he filed a motion for return of
> property, I think for a computer, which was considered contraband and they did not

– they did not return that. So that was the other item that – and I think he had some stuff related to – he was a dance instructor once, had some stuff related to that, and I think some online game or video game or something that he had played and he wanted the return of that specific stuff and the computer.

R. 108-09. That explanation led to the following exchange between Lewis and respondent's attorney

at the evidentiary hearing:

Q: So it's your testimony that you did not discuss filing a notice of appeal or anything about an appeal with Ms. Smiley?

A: No, no. The letter or the email that was sent, I guess on April 25th – I think it said April 25th 2017, where she talks about reconsideration of the sentence, she did. I said the same thing to her. I mean, I – I apologized. She was very upset. I mean, 188 months is a – is a long time. We had had a discussion beforehand that it might go that way, because I – I mean, I'm big on managing expectations, and if it ends – if it ends up going better, then great, we're all happy. But I don't want it to go worse and not explain that it's likely to happen.

And so she said, is there any way – or she said, can we – can we ask the judge to reconsider the sentence?

So what I heard – I know that there's a difference between an appeal and reconsideration. What I heard, based on what she said and the language she used, was that she wanted [Movant] to get less time. She was upset that he had gotten the full 188 months, top of the guidelines.

And I said, we could file a motion for consideration [sic], but it would be this same judge that would be reconsidering the sentence that he just imposed, and I would not think that would be fruitful. He is not going to change his mind.

And that was the entirety of any discussion we had with respect to the sentencing that occurred.

Q. Okay. So was the discussion you just talked about – did that occur on the day of sentencing, or was it –

A. It did.

Q. – in response to the email?

A. No, that occurred on the day of sentencing. When she sent the email, she once

14

again brought up the reconsideration and used the words "reconsideration." . . .

R. 109-10.

## E.  Post-Sentencing Events

Movant did not see or speak to Lewis again after sentencing. R. 39. With his one allotted phone call, he called his fiancée from the Terry County Jail. R. 41. She met him there, they had a "very emotional visit," and Movant "believe[s] she brought up an appeal at that time." *Id.*

According to the fiancée, when she met Movant in Terry County Jail, she asked whether he had called Lewis and when he responded that he "only get[s] one phone call," she told him that they needed to talk to Lewis "to make sure" Movant gets an "appeal submitted." R. 69. When Movant questioned "well, what's there to appeal," she told him "it doesn't matter what you have to appeal; you're supposed to have an appeal. You have that right." *Id.* At that point, he directed her to inform Lewis that he wanted to appeal. *Id.* After her visit with Movant, she called Lewis from the airport and left a voicemail asking him to call her back. R. 70-71. Lewis testified that her voicemail mentioned seeing Movant in jail and "she wanted to talk about how to get his property back." R. 128. She did not talk to Lewis at all after that point. R. 71.

Four days later, on April 25, 2017, she emailed the firm with questions about what to do about the sentence. R. 72-73. In Item 3 of the email, she specifically states:

> I don't know what other outstanding items would be available, such as reconsideration of sentencing or other things we can do to help facilitate [Movant] getting to Virginia, but [Movant's father] and I would like a conference call with [Lewis] so that the three of us are on the same page of matters regarding [Movant's] case and his well being.

Ex. 3. While recognizing that getting Movant to Virginia differs from asking about an appeal, her intent was to find out what could be done "to get his sentence looked at again." R. 73.

The email resulted in a phone conference set for May 4, 2017. R. 73. Although she expected Lewis to be on the conference call, Gallian called her and Movant's father because Lewis was in court. R. 73-74. When she asked him about appealing the sentence, Gallian said that he would not "recommend appealing the sentence, because he thinks it would make things worse." R. 75. When she asked "how much time do we have if we want to appeal?" he told her that they had "30 days or so" to appeal, but he was "not sure." *Id.* She believed that based on that exchange she told Gallian that they "still wanted an appeal," but he just did not think it was a good idea. *Id.* Gallian also informed her that "he wasn't an appellate attorney and that he wasn't actually capable of making that recommendation for [them], that [she would] have to seek other counsel." *Id.* At that point, she "wanted to find somebody that could help me find the answer to how to appeal, but [she] didn't know who to talk to." R. 75-76. While she thought they had thirty days to appeal, she lacked funds to hire another attorney. R. 76.

On cross-examination, the fiancée stated that her email (Ex. 3) was her attempt to convey that Movant wanted to appeal. R. 80. When asked whether her wording was unclear, she merely stated that she understands that she may not have used the precise legal terminology. *Id.* She also conceded that she did not specifically say that Movant wanted to file an appeal, but she explained that Gallian's hesitancy regarding an appeal and hesitancy caused by misinformation provided to her, she "couldn't clearly say, just file the appeal." R. 81. She also states that she did not know she needed to use specific language to have the firm file an appeal. *Id.*

On re-direct examination, she explained that she believed that the attorneys knew she wanted them to do something about the sentence despite her chosen words. R. 81. Although she did not know whether that was seeking reconsideration or filing an appeal, she expected the attorneys to

know what to do.  R. 82.

Movant's father also participated on the May 4, 2017 conference call with Gallian and want-
ed to discuss various issues:  (1) submitted PSR changes that had apparently gone unresolved; (2)
unreturned property; and (3) what could be done regarding an appeal.  R. 89-90.  He wanted Lewis
on that call.  R. 89.  He wanted to have the character letters, psychological information, and military
history taken into consideration on appeal.  R. 89-90.  The imposed sentence was simply not accept-
able to Movant or his father.  R. 90.  Gallian was unhelpful and simply said that "he would make
notes and get back to us," but he did not contact them again.  *Id.*

Although the father does not recall Gallian saying they had thirty days to appeal, he was
under that impression from that phone call or subsequent ones even though he does not "remember
the source of that."  *Id.*  He understood that Lewis and his firm were "only there for this trial" and
"were not appeal attorneys," but he assumed "that they would provide proper documentation and
notice to the courts that an appeal was – was necessary."  R. 91.  Moreover, during the May 2017
conference call, he expressed his son's desire to appeal.  R. 91-92.  The firm knew that he was acting
as an agent for his son and not just wanting an appeal on his own behalf.  R. 92.

Gallian also testified about the May 4, 2017 conference call.  R. 134-38.  After discussing
other items raised in the April 25, 2017 email, the fiancée and father "essentially" asked "if I be-
lieved that Judge Cummings was going to reconsider his sentence."  R. 135.  To which he responded:

> I told them obviously I wasn't at the sentencing, but what had been relayed to me, it
> didn't seem like – or it seemed like a pretty swift proceeding, as is common with
> Judge Cummings, from our understanding, and that it didn't seem likely that there
> was going to be a reconsideration by Judge Cummings himself in this case.

*Id.*  When asked whether the fiancée or father asked him about filing an appeal, he stated:

17

> No, they didn't ask about the appeal. What they said was, do we have grounds for appeal? And it's a practice of mine, always has been, that when . . . someone asks me a question like that, I immediately say, I am not an appellate attorney; I can't honestly tell you what grounds for appeal there might be in this case, but we can file – as we do in every case when asked, we can file a notice of appeal that will start the process.

R. 136; *accord* R. 137. He told them they had fourteen days to appeal and, at that point, he thought they had one more day to appeal. R. 136. According to his testimony, he did not believe that he told them that they had "better hurry up and make a decision quickly, because [they] only have one more day." R. 137. He gave no other advice regarding what to do about filing an appeal except to encourage them to contact the firm if they have any questions. R. 136-37.

After speaking to Gallian, no one from the firm provided any instructions on what the fiancée needed to do to file an appeal. R. 77. Nor did anyone unequivocally say that they "don't do appeals; you need to file a notice of appeal; you need to call the Court and do something about it now." *Id.* "About September," a consultant informed her that it was too late for an appeal, they only had fourteen days to file, and now a § 2255 motion was their sole alternative. R. 76.

## F. Other Testimony and Evidence

Movant conceded that he never personally contacted counsel after sentencing and did not contact the Court about appealing. R. 43-44. He knew he could appeal and intended to appeal. R. 45-46. He knew his right to appeal and had had sufficient conversations with Lewis and had done enough independent research to determine he wanted to appeal. R. 46. But despite knowing he had a right to appeal, Movant did not understand the process of appealing – he did not know what he needed to do in that respect. *Id.*

While he knew he had not paid Lewis to represent him on appeal, he thought that at the very

least he would provide guidance as how to proceed with an appeal. R. 47. And although he understood that Lewis would provide representation only through sentencing, he also believed that counsel would provide some representation after sentencing, such as providing information as to what he should do next. R. 12. He formed this belief when Lewis mentioned another client whom he maintained contact even after conviction. *Id.* Lewis also reinforced the belief with his email response that Movant could contact him after sentencing. *Id.*; Ex. 1.

Furthermore, while Lewis and Movant agree that the retainer did not include representation on appeal, Lewis admitted that it is his practice to file a notice of appeal when necessary and he had recently done that in a different case. R. 97-98. He stated that, in "every single federal case," his practice is to have a conversation with his client about appeals prior to a guilty plea and prior to sentencing. R. 98. Before sentencing, he wants to remind his client:

> I am going to ask you about if you want an appeal. If you want an appeal, we will file a notice of appeal, because it's got to be done within 14 days. And at the same time we file a notice of appeal, we will file a motion to withdraw. That way, if you want to complain about anything that I did, you can have an appellate attorney – not me – who will . . . do that in their appeal.

*Id.* Filing those documents is neither time-consuming nor difficult – it takes less than twenty minutes to make necessary changes to form documents stored on the firm's computers. *Id.*

As already set out previously, Lewis testified as to the instances where he spoke to Movant about his appellate rights. *See* R. 102-04. This led to the following exchange between him and counsel for the Government:

> Q. Okay. Over the course of those conversations, did you talk to [Movant] about what types of things could be raised on appeal?
>
> A. We talked about – I don't know that we had a specific discussion about everything that could be – that could be raised on appeal. I did say generally that if – if the

judge does something at sentencing or if the judge makes a mistake or if there's – there's something that we ask for that is denied, then those are things that we can appeal.

R. 104.

Lewis viewed Movant as a "very smart" and "extremely thorough" individual who would independently research issues. R. 99-100. The testimony at the evidentiary hearing fully corroborates that view. He also testified that, at no point during his representation of Movant, did Movant ever direct him to file an appeal. R. 110. Furthermore, according to Lewis, Movant never said, "if my sentence is X, I want to file an appeal." *Id.* In addition, no one on Movant's behalf ever told Lewis to file a notice of appeal. R. 111.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Movant asserts that his attorney rendered ineffective assistance of counsel under the Sixth Amendment when counsel failed to file a notice of appeal ("NOA") as requested and failed to fulfill his consultation obligations regarding issues for appeal.

### A. Applicable Law

Courts review Sixth Amendment claims of alleged ineffective assistance of counsel under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). In general, to succeed on a such a claim, a convicted defendant must demonstrate (1) deficient performance by his or her attorney and (2) prejudice from that deficient performance. *See Strickland*, 466 U.S. at 687. This test applies generally "in federal collateral proceedings."[3] *Id.* at 697 (applying test in context of a federal habeas action under 28 U.S.C. § 2254). It applies particularly to claims "that counsel

_____

[3] Of course, an action arising under § 2255 qualifies as a federal collateral proceeding. *See West v. Schneiter*, 485 F.3d 393, 394 (7th Cir. 2007).

20

was constitutionally ineffective for failing to file a notice of appeal." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). The test does not create a rigid hierarchy that compels courts to address the prongs in any particular order. *See Strickland*, 466 U.S. at 697 ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) (quoting *Strickland* that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 697; *accord United States v. Bejarano*, 751 F.3d 280, 285 (5th Cir. 2014) (per curiam).

Under the first prong of *Strickland*, a movant must demonstrate that the performance of his attorney "fell below an objective standard of reasonableness." 466 U.S. at 688. The attorney's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687; *accord Buck v. Davis*, 137 S. Ct. 759, 775 (2017) (reaffirming proposition). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.

When determining whether an attorney's performance is constitutionally deficient, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689; *accord Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012). "A conscious and informed decision on trial tactics and strategy

cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington v. Richter*, 562 U.S. 86, 110 (2011). Further, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691.

In most cases, the movant must also show that he was prejudiced by his attorney's sub-standard performance. *See id.* at 687, 692. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. More specifically, to demonstrate prejudice, a movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington*, 562 U.S. at 111. Rather, "*Strickland* asks whether it is 'reasonably likely' the result would have been different," an inquiry that "does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id.* at 111-12 (quoting *Strickland*, 466 U.S. at 693, 696-97). To warrant a finding of prejudice, the convicted defendant must show a substantial "likeli-

hood of a different result," not just a conceivable possibility. *Id.* at 112.

In *Flores-Ortega*, the United States Supreme Court specifically addressed a claim of ineffective assistance of counsel for failing to file a notice of appeal. *See* 528 U.S. at 477-87. With respect to that sort of claim, the deficiency-prong of the *Strickland* analysis "begins with the question whether counsel 'consulted' with the defendant regarding an appeal" – that is, whether counsel advised "'the defendant about the advantages and disadvantages of taking an appeal, and [made] a reasonable effort to discover the defendant's wishes.'" *United States v. Pham*, 722 F.3d 320, 323 (5th Cir. 2013) (quoting *Flores-Ortega*, 528 U.S. at 478)).

"If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." *Flores-Ortega*, 528 U.S. at 478.

> *Flores-Ortega* applies even where a defendant has waived his right to direct appeal and collateral review. In such circumstances, if the petitioner is able to demonstrate by a preponderance of the evidence that he requested an appeal, prejudice will be presumed and the petitioner will be entitled to file an out-of-time appeal, regardless of whether he is able to identify any arguably meritorious grounds for appeal that would not be precluded by the terms of his appeal waiver.

*United States v. Tapp*, 491 F.3d 263, 266 (5th Cir. 2007). As stated in *Flores-Ortega*, a "defendant, by instructing counsel to perfect an appeal, objectively indicate[s] his intent to appeal and [is] entitled to a new appeal without any further showing." 528 U.S. at 485 (discussing holding in *Rodriguez v. United States*, 395 U.S. 327 (1969)). Circumstances justify a presumption of prejudice when convicted defendants instruct their attorneys to file an appeal "only to have counsel refuse or forget . . . because defendants abandoned by their lawyers have suffered injury from that very fact – from the loss of advocacy services that could have been used to *establish* a non-frivolous issue for appeal."

23

*Vinyard v. United States*, 804 F.3d 1218, 1228 (7th Cir. 2015) (citation and internal quotation marks omitted).

When counsel has not consulted with his or her client about an appeal, the question of deficient performance is more difficult. In such circumstances, "the question is whether that failure was unreasonable because it breached the duty to consult." *Pham*, 722 F.3d at 324. As the Supreme Court has held,

> counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are non-frivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known. Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Flores-Ortega*, 528 U.S. at 480 (citation omitted). "The Supreme Court predicted that district courts would find a duty to consult 'in the vast majority of cases.'" *Pham*, 722 F.3d at 324 (quoting *Flores-Ortega*, 528 U.S. at 481).

When a convicted defendant claims that his attorney breached the duty to consult about an appeal, the courts do not presume prejudice. They instead require the defendant to "demonstrate that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Flores-Ortega*, 528 U.S. at 484. This is a fact-intensive inquiry and "evidence that there were nonfrivolous grounds for appeal or that the defendant in quest-

24

ion promptly expressed a desire to appeal will often be highly relevant in making this determination." *Id.* at 485. Although "the performance and prejudice prongs may overlap, they are not in all cases coextensive." *Id.* at 486. For instance,

> [t]o prove deficient performance, a defendant can rely on evidence that he sufficiently demonstrated to counsel his interest in an appeal. But such evidence alone is insufficient to establish that, had the defendant received reasonable advice from counsel about the appeal, he would have instructed his counsel to file an appeal.

*Id.* at 486. While there must be a "probability sufficient to undermine confidence in the outcome," *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 694), the defendant need not show "that his hypothetical appeal might have had merit," *Flores-Ortega*, 528 U.S. at 486. The defendant must merely "demonstrate that, but for counsel's deficient conduct, he would have appealed." *Id.*

## B. Analysis

The testimony presented to the Court differs in many respects. However, most of the differences do not call into question the credibility of any particular witness. Instead, differences in testimony often stem from failures of recollection or simply imprecise word usage. A failure of recollection differs materially from a specific recollection that something did not occur.

In any event, having heard testimony from the witnesses in open court, the undersigned finds that there is no dispute that Movant knew he had the right to appeal and that he had fourteen days to do so. While there may have been some confusion about whether Gallian stated that the deadline might be thirty days as testified to by the fiancée, her testimony also indicates that Gallian expressed uncertainty about that deadline. Regardless, Movant failed to meet either filing deadline. Thus, any potential confusion about the deadline is immaterial to this recommendation.

Similarly, there is no dispute that, during the brief conversation with counsel following his sentencing, Movant did not expressly direct counsel to file an appeal. As he did when he met his fiancée following sentencing, Movant at most questioned what grounds he may have for appeal. The testimony of the fiancée provides strong support for finding that initially Movant merely questioned what basis he may have to appeal. And Lewis specifically testified that Movant answered "No" when counsel asked if he wanted to file a notice of appeal. Even if Movant answered, "No," he had fourteen days to change his mind and relay that information to counsel.

After this brief conversation between counsel and Movant, counsel conversed with the fiancée in the marshals' office. While she testified that she asked him "if" or "when" he was going to submit an appeal, she also stated that he did not answer the question, but instead said he had a flight to catch and would talk to her later, which he never did. Lewis testified that they spoke about Judge Cummings reconsidering the sentence. Although his testimony on this issue is less clear than it might be, i.e., seeming to remember "some questions about did he file a notice of appeal" and answering "No" to a poorly worded question as to whether it was his testimony that he did not discuss filing a notice of appeal, his testimony as a whole supports a finding that they discussed reconsideration not an appeal. Additionally, the fiancée's testimony at the evidentiary hearing clearly reflects uncertainty about the legal distinction between reconsideration and an appeal, so the Court should find that this conversation concerned reconsideration and not specifically an appeal. At most, there was an unanswered question about an appeal that does not reflect any express direction for Lewis to file an appeal.

The evidence as a whole supports that finding. Such finding is consistent with her testimony about her first conversation with Movant after sentencing where she stressed that they "need to talk"

to Lewis "to make sure" that an appeal is submitted. It is also consistent with her subsequent email specifically asking about reconsideration without mentioning an appeal. Furthermore, during that first post-sentencing conversation between Movant and his fiancée, they agreed that his next step should be an appeal and Movant entrusted that task to his fiancée. He told her that he needed her to tell Lewis that he wanted to appeal. Had the fiancée already instructed counsel to appeal, Movant would have had no such need to do so again.

Despite Movant urging her to tell Lewis that he wanted to appeal, she did not instruct him to file an appeal when she left a voicemail later that day. Similarly, she did not expressly mention an appeal when she emailed the firm later that week about various concerns. In that email, she instead asked about reconsideration even though her testimony reflects that she and Movant specifically talked about an appeal at the jail. While her intent was to see what could be done about reducing his sentence, she did not express that intent in terms of an appeal.

That email led to the telephone conference call with Gallian on May 4, 2017. Although the fiancée believed her questions on that call evinced an intent to appeal, she conceded on cross-examination that she did not clearly say file the appeal. The father specifically testified that he told the firm that his son wanted to appeal, but Gallian was not helpful and simply said that he would take notes and get back to them. Gallian testified that they spoke about reconsideration and other matters raised in the April email. Although he disagreed that anyone said that they wanted to appeal, he did concede that someone inquired as to whether Movant had grounds for an appeal, which prompted him to say that he was not an appellate attorney and would not know what grounds may exist for an appeal, but the firm can file a notice of appeal when requested.

A "failure to file a requested NOA is per se ineffective assistance of counsel, with or without

27

a showing that the appeal would have merit." *United States v. Tapp*, 491 F.3d 263, 265 (5th Cir. 2007). If Movant demonstrates "by a preponderance of the evidence that he requested an appeal," the Court will presume prejudice and he will be entitled to an out-of-time appeal. *See id.* at 266.

In this case, only the father specifically testified that he directed counsel to file an appeal. But Gallian refutes that testimony and the fiancée provides no testimony to corroborate the father's testimony. Due to the nature of a claim of ineffective assistance of counsel, Gallian has a potential bias that could adversely affect the credibility of his testimony. Similarly, the credibility of the father's testimony may be compromised by an inherent bias he may have due to the father-son relationship. This is not to suggest that the father intentionally testified falsely, but the close relationship with his son certainly could have colored his view of what transpired. Based on the record as a whole, there appears to be no strong basis to find either witness more or less credible than the other.

Based on the evidence, the Court should find that Movant has not shown by a preponderance of the evidence that he or his agents requested an appeal. The duty to perfect an appeal on behalf of a convicted client does not arise on conviction, but when the client makes known to counsel his desire to appeal the conviction. *Childs v. Collins*, 995 F.2d 67, 69 (5th Cir. 1993). The client must timely and clearly communicate his desire to appeal to his attorney. *See id.* Movant has not carried his burden to show the existence of such communication. Had he carried that burden the Court would have no reason to question whether counsel had consulted with him about an appeal.

However, because Movant has not carried that burden, the process of determining whether counsel provided effective representation requires the Court to consider whether counsel consulted with Movant regarding an appeal. Consulting goes beyond informing the defendant that he has the

28

right to appeal and the time-period for doing so. It has two necessary components: (1) advice regarding the advantages and disadvantages of appealing and (2) a reasonable effort to ascertain the client's wishes regarding an appeal. *See United States v. Pham*, 722 F.3d 320, 323 (5th Cir. 2013) (citing *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000)).

Of course, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984). Accordingly, courts "deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. Courts must "determine whether, in light of all the circumstances, counsel's actions fall outside the wide range of professionally competent assistance." *Id.* This focus on the totality of the circumstances requires the courts to consider all information known to counsel as well as information counsel should have known. *Flores-Ortega*, 528 U.S. at 480.

Here, it is clear by counsel's own testimony that he and Movant discussed the right to appeal on multiple occasions before sentencing. But, like the attorney-client discussions in *Pham*, counsel in this case appears to have merely "discussed an appeal in the abstract." *See* 722 F.3d at 324. This is insufficient to satisfy the duty to consult. *See id.*

Although counsel discussed various aspects of appealing with Movant prior to sentencing, there is no testimony that any attorney ever advised him of the advantages and disadvantages of appealing. Upon his hiring, Lewis informed Movant that the retainer does not cover an appeal. Counsel testified that he did not discuss an appeal at arraignment and any discussion about it at or near the re-arraignment focused on Movant having the right to appeal and the deadline for doing so.

29

Similarly, counsel's discussion of appeal prior to sentencing focused on the abstract right to appeal and the filing deadline. Furthermore, neither Lewis nor Gallian provided any post-sentencing advice to Movant, his fiancée, or his father about the advantages and disadvantages of appealing.

Not only does the evidence fail to show that counsel advised Movant about the advantages and disadvantages of appealing, but the evidence also indicates that counsel made insufficient efforts to determine what Movant wanted with respect to appealing. At no point prior to sentencing did counsel make any reasonable effort to determine what Movant wanted in that respect. Of course, Movant's own actions and testimony indicate that he was not focused on an appeal at that point and that thoughts about appealing were not his priority prior to hearing his sentence in open court. Still, the PSR showed a sentencing range of 151 to 188 months and counsel advised Movant to expect a top-of-the-guidelines sentence. Movant's known focus was obtaining the shortest sentence possible whether through a downward variance or simply at the bottom of the range. It would be a simple matter to ask Movant – prior to sentencing – what range would likely invoke a desire to appeal and what range would not. With such an inquiry, counsel could have ascertained Movant's desires with an understanding that events at or after sentencing may affect those desires. But nothing of record indicates that counsel made such an inquiry.

Naturally, the reasonableness of the efforts taken to determine a client's desires regarding an appeal must also take into consideration any post-sentencing efforts. The evidence shows that, immediately after sentencing, Lewis specifically asked Movant whether he wanted to file a notice of appeal. In general, had Movant responded with a definite "yes" or "no" there would be no question as to whether counsel had consulted about an appeal. *See Flores-Ortega*, 528 U.S. at 478. When a defendant has instructed counsel to file an appeal or specifically instructed counsel not to appeal,

there is generally no need to question whether counsel engaged in reasonable efforts to consult. *See id.* While counsel remembered Movant responding with "No" and Movant adding that he saw no grounds for an appeal, Movant recalls more of a questioning response to the effect of "what do we have to appeal?" or "what is there to appeal?". Movant, however, was uncertain as to exactly how he responded. Plus, he was admittedly very confused, emotional, and shocked when answering the inquiry. Under the testimony given, it is reasonable to accept the attorney's version of the conversation as the most accurate.

But accepting that testimony as the most accurate does not dictate that the Court find his post-sentencing efforts reasonable. The chaotic circumstances of that exchange between counsel and Movant cut against, but certainly do not preclude, finding it reasonable. When the Court also considers the exchange between counsel and Movant's fiancée right after sentencing, her voice message to counsel later that day, her follow-up email to the firm, and the scheduled May 4, 2017 conference call to discuss various matters, it should find the single inquiry to Movant not reasonable under the totality of the circumstances. And neither Lewis nor Gallian made any other effort to determine Movant's desire for proceeding with an appeal.

For these reasons, the Court should find that counsel did not consult with Movant about pursuing an appeal. The question thus becomes whether the failure to consult was unreasonable because it breached the constitutionally imposed duty to consult. While prior to sentencing, counsel may have had no reason to think that a rational defendant would want to appeal or that Movant was interested in appealing, the constitutionally imposed duty to consult does not cease simply because a client has been sentenced. Indeed, events occurring at and after sentencing must be taken into consideration when determining whether an attorney has breached the duty to consult.

31

Here, appointed counsel for Movant pursued testimony to suggest that Movant might have a meritorious claim for relief based upon the sentencing judge's failure to consider the factors set out in 18 U.S.C. § 3553(a). *See* R. 122-24, 131. However, that line of reasoning was not pursued in Movant's Proposed Findings of Fact and Conclusions of Law. *See* Doc. 38. The focus in that filing was that Movant clearly showed that he was interested in appealing. *See id.* at 10. Given that shifted focus in the briefing, the Court's initial focus should likewise be on whether Movant reasonably demonstrated to counsel that he was interested in appealing.

The Court must consider the totality of the circumstances including all information counsel knew or should have known. A conviction based on a guilty plea is highly relevant but, in this case, counsel knew or should have known that Movant desired a sentence at the lower end of his guidelines range or lower. His plea, moreover, imposed no limitation on his right to appeal. Although the Court sentenced Movant within the PSR guidelines range, Movant did not bargain for a 188 month sentence.

This case presents a series of conversations that reasonably demonstrate that Movant had a desire to appeal. While there may have been no specific instruction for counsel to file an appeal, an interest in appealing should have been apparent based on all information counsel knew or should have known. Some courts have found a duty to consult when a defendant asks post-sentencing general questions such as "what's next? What can we do now?". *See United States v. Pham*, 722 F.3d 320, 325 (5th Cir. 2013). Had Movant asked his attorney "what do we have to appeal?" or "what is there to appeal?", such inquiries may have triggered a duty to consult. But Movant's testimony expresses uncertainty as to how he interacted with counsel following sentencing and counsel's version differs. Nevertheless, when the fiancée asked about reconsideration of Movant's sentence, she

exhibited an interest in "doing something to change the outcome of this sentencing through additional proceedings," which in a proper context, may be sufficient to "trigger counsel's constitutional duty to consult" with Movant about an appeal. *See id.* (holding that the defendant's desire "to do something to get less time" was adequate to trigger the duty to consult). A layperson's request for "reconsideration" of sentence may be sufficient to trigger a duty to consult. Use of "the magic word 'appeal'" is not necessary "to trigger counsel's duty to advise" about an appeal. *Id.* Even if the context of the reconsideration discussions were insufficient to trigger the duty, at the very latest, counsel knew or should have known that Movant was interested in appealing when his fiancée and father met with Gallian and specifically asked about grounds for appeal. Although that interest may have been reasonably demonstrated to counsel even earlier, it only matters whether Movant (or in this case his agents) reasonably demonstrated such interest before the time for appeal passed. On the facts of this case, the Court should find that Movant reasonably demonstrated to counsel that he was interested in appealing. Consequently, it should find that counsel breached the constitutionally imposed duty to consult by failing to consult with Movant within the meaning of *Flores-Ortega*.

Although, with respect to deficiency of counsel, Movant may rely on evidence that he sufficiently demonstrated his interest in an appeal to counsel, he needs additional evidence to establish that had he received reasonable appellate advice he would have instructed counsel to file an appeal. To be sure, there is post-sentencing ambiguity as to whether Movant stated his desire to appeal, but both he and his fiancée testified credibly that, at the Taylor County Jail, they knew their next step was to appeal. The fiancée testified credibly as to her efforts to convey that to counsel. While her chosen terminology may not have been the most precise, she or Movant's father reasonably demonstrated to counsel during the May 4, 2017 conference that Movant was interested in an appeal.

Further, both Gallian and Lewis testified that the firm would have filed an appeal had someone merely asked them to do so. Lewis testified that doing so was a simple matter that would take about twenty minutes. He testified that he had done so for other clients even though he is not an appellate attorney. Given the retainer already paid by Movant, it appears highly unlikely that Movant would have incurred any additional expense by having Lewis or his firm file a notice of appeal on his behalf. Additionally, although counsel had not informed Movant that he could seek appointed counsel for appellate purposes, the Court had mentioned that possibility at sentencing.

To put all the evidence in the proper perspective, Movant paid Lewis and his firm $15,000 to get the lowest sentence possible. From the outset, Movant accepted responsibility for his crime, intended to plead guilty, and was focused on obtaining the lowest sentence reasonable under the circumstances. Counsel made no legal objection to any sentencing calculation. He submitted a sentencing memorandum to the Court, including character letters and a report from Movant's therapist. At sentencing, he made arguments on Movant's behalf. Even though he advised Movant to expect a top-of-the-range sentence, Movant retained him to do all he could to obtain a lower sentence. Upon imposition of a 188 month sentence, Lewis essentially made a single, brief inquiry about whether Movant wanted him to file a notice of appeal. Although Movant's fiancée and father scheduled a telephone conference, Lewis was unable to attend even though it was one day before the appellate deadline expired. When Gallian addressed an inquiry about grounds for appeal, he did not provide an adequate answer. And his statement that he encouraged them to reach out to the firm if they had any other questions makes little sense when the appellate deadline would expire the next day.

Considering the record as a whole, the Court should find that Movant has demonstrated that,

34

but for the deficient performance by counsel, he would have appealed. Not only did Movant's guilty plea not limit his appellate rights, his top-of-the-guidelines sentence provides incentive to appeal regardless of the merit of any appellate issues. There is no self-evident reason why Movant would not have filed an appeal. Movant also raise a number of claims in his amended § 2255 motion that go beyond the scope of the referral in this case. If the Court finds any properly appealable issue to have merit, such issue would provide additional reason to find that he would have appealed had counsel actually taken the effort to consult with him about the pros and cons of appealing.

For all of these reasons, the Court should find that counsel did not render deficient representation by failing to file an appeal following an express instruction to do so, but counsel did perform deficiently by failing to adequately consult with Movant about an appeal and that, but for that deficiency of counsel, Movant would have filed an appeal. Accordingly, the Court should deny Ground 8 of the amended motion to vacate and grant Ground 7. Because Movant was denied the effective assistance of counsel, the Court should grant him an out-of-time appeal and re-enter "the judgment of conviction to permit an appeal." *United States v. Rivas*, 450 F. App'x 420, 429 (5th Cir. 2014) (per curiam).

## IV. CONCLUSION

For the foregoing reasons, the undersigned **RECOMMENDS** that the Court **DENY** the claim that counsel provided ineffective assistance of counsel by failing to file a notice of appeal (Ground 8) but **GRANT** the claim that counsel rendered ineffective assistance by failing to consult with Movant about his desire to appeal (Ground 7). The Court should reinstate Movant's appellate rights by reentering the judgment of conviction to permit an appeal in the underlying criminal action.

A copy of this Report and Recommendation shall be served on all parties in the manner pro-

35

vided by law.  Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the District Court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

**SO ORDERED this** *14* **day of February, 2019.**

E. SCOTT FROST
**UNITED STATES MAGISTRATE JUDGE**